GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
California Bar No. 149883
Assistant United States Attorney
Chief, Asset Forfeiture Section
Federal Courthouse, 14th Floor
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-6166
Facsimile: (213) 894-7177
E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
United States of America

FILED
2009 OCT -8 PM 3:48
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>$455,951.00 IN FUNDS SEIZED FROM CHINATRUST COMMERCIAL BANK,<br>Defendant. | NO. CV CV09-7340 AHM AJWx<br>**VERIFIED COMPLAINT FOR FORFEITURE**<br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br>[FBI] |

For its claim against the defendant bank funds seized from Chinatrust Commercial Bank, and described more particularly below, plaintiff United States of America alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action for the civil forfeiture of property pursuant to 18 U.S.C. § 981(a)(1)(C).

2. This court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355(a).

3. Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1355 and 1395. Specifically, some of the acts giving rise to the forfeiture occurred in this district, establishing venue in this district pursuant to 28 U.S.C. § 1355(b)(1)(B) and (2).

**THE DEFENDANT PROPERTY**

4. The defendant is USD $455,951.00 in bank funds seized from Chinatrust Commercial Bank, Ltd., Room 2801, 28th Floor, Two International Finance Center, 8 Finance Street, Central, Hong Kong, account #904133019200, with an account holder identified as Paulite International Corp. ("Paulite") The defendant funds were seized by authorities in Hong Kong and are being held for purposes of these proceedings pursuant to an official request from the United States based upon a seizure warrant issued in this district on March 18, 2009 by the Honorable Victor Kenton, United States Magistrate Judge. The defendant funds shall remain in the custody of Hong Kong authorities during the pendency of this action.

**SUMMARY OF FACTS SUPPORTING FORFEITURE**

5. Eli Haber ("Haber") and David Ziv ("Ziv"), two United States businessmen, caused the payment of approximately USD $3,000,000.00 to be made to Paulite as ransom money payment for the release of Haber and Ziv after they had been kidnaped in southern China by Paul Lin ("Lin") and others on February 26,

2009. Two million dollars were transferred from the United States to Tai-Trans Trading Co., Ltd in Taiwan, and then the entire ransom payment was forwarded to Paulite in Hong Kong. The defendant bank funds represent or are traceable to said ransom money payments, or were monies seized from the account into which such payments were deposited, rendering them subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

**FACTS SUPPORTING FORFEITURE**

6. On March 2, 2009, the Federal Bureau of Investigation ("FBI") received information that two American businessmen (Haber and Ziv) had been kidnaped in China, and a USD $3,000,000.00 ransom had been paid to Paulite for their release.

7. Haber is the Chief Executive Officer of Bel-Air Lighting Company in Valencia, California ("Bel-Air Lighting"), and a citizen of the United States. Bel Air Lighting imports and distributes lighting products. Haber's main partner in the business is Ziv, who is the Chief Operating Officer for Bel-Air Lighting and a citizen of the United States. He has worked at the Bel Air Lighting and known Lin for approximately twenty years.

8. Bel-Air Lighting has multiple suppliers in China for lighting products. For many years, its largest Chinese supplier was Gem Lighting, operated by Lin, with whom Haber had done business for approximately thirty years. Prior to the kidnaping, Haber had moved most of Bel-Air Lighting's orders from Lin's

company to other factories in China because the quality of Lin's products had deteriorated significantly.

9. On February 14, 2009, Haber and Ziv departed Los Angeles International Airport on China AirLines flight CI007. Over the next ten days, Haber, Ziv, Kevin Yeh ("Yeh"), and Yeh's nephew ("Hugh"), visited numerous factories and suppliers for Bel-Air Lighting in southern China. Yeh has been Bel Air Lighting's agent in Taiwan for approximately thirteen years. Yeh resides in Taiwan, and speaks Taiwanese and Mandarin.

10. Haber and Ziv were scheduled to meet with Lin for lunch on Friday, February 27, 2009. Prior to Haber and Ziv's trip to China, Yeh had told Haber that he had passed Lin's factory and observed a number of "rogues" with guns. Yeh believed that these individuals were protecting Lin. Because of this information from Yeh, Haber had decided not to go to Lin's factory, but to meet with him elsewhere. They were to discuss business and reconcile credits and payments between their respective companies. Over the thirty years during which Haber and Lin had done business, Haber had an open revolving business account with Lin. At the time, Haber believed that his accounts payable balance with Lin was approximately $2,000,000. In fact, Bel-Air Lighting had no outstanding debts to Lin or his company in February 2009.

11. While they were at a plant operated by a company called ATTCO, Haber was informed that Lin had made several telephone calls attempting to determine whether Haber and Ziv were at the

ATTCO factory. When the Bel-Air group left the ATTCO plant in Yeh's Honda Accord, Yeh was driving, Hugh was in the front passenger's seat, and Haber and Ziv were in the backseat. Haber noticed a van on the road just outside the factory, and Yeh and Haber commented that it was Lin's van. Moments later, Yeh's Accord was forced off of the road by a truck and then struck from the rear by Lin's van.

12.   Altogether, there were seven abductors: six Mainland Chinese and LIN. Four of the abductors approached the car. Yeh and Hugh were taken out of the Accord, put in Lin's van, and told to keep their heads down. Two of the abductors got into the rear seat of the Honda with Haber and Ziv, one with a small (1-2 inch barrel) black revolver which he shoved into Haber's ribs. Every time Haber began to ask what was happening, they told him "shh, no speaking." Lin sat in the front passenger's seat, and another of the abductors drove the Accord. The abduction began in Dongguan City, China (Guangzhou Province).

13.   The Accord was driven in tandem with the van for approximately ninety minutes to a semi-remote cabin that Haber believed might have been in the port city of Yan Tian. The cabin had a living room inside the front door and two bedrooms, one on each side of the living room, and was furnished. There was also a television in the living room.

14.   Haber, Ziv, Yeh and Hugh were taken into the cabin, where Lin and the other abductors stated (in Chinese) that Haber owed them eight million dollars. Lin and the abductors spoke

only a few words of English, so the conversations were translated by Yeh. Haber told Lin that he did not believe Bel-Air owed him any money, and that he did not have access to that kind of money in any event. When Haber later told them that he could probably come up with one million dollars, the abductors said they wanted the entire eight million.

15. The abductors told Yeh that if they did not get the money they were demanding, the four members of the Bel-Air group would not be allowed to leave. One of the abductors told Ziv that watch on his wrist was very attractive, and they would hate to see the day when Ziv did not have a wrist on which to wear his watch.

16. At some point, Lin and some of the abductors took Yeh and Hugh into separate bedrooms. Haber could hear noises coming from the bedrooms, and believed that Yeh and Hugh were being beaten. Later, Yeh told Haber that the kidnapers had been punching him in the stomach. Haber saw that Yeh had a red mark on his stomach when he returned from the bedroom. Yeh stated that he was punched twice in the stomach by the abductors, who also kicked the bed to make noise, and create the impression that he (Yeh) was being severely assaulted. One of the abductors also told Yeh to lie down to make it look like he had been seriously assaulted. The abductors told Yeh that they were targeting the Americans, not Yeh.

17. After Yeh was brought back from the bedroom, one of the abductors produced an ax and a large combat-style knife

(approximately 20 to 30 centimeters long). Ziv asked the abductors to put the ax and knife away, and was struck in the face by one of the abductors. One of the abductors said that if the money was not paid, the abductors would start breaking the arms and legs of the Bel-Air group, and would cut off their fingers.

18. The main abductor told Haber that he was a glass supplier to Lin and that Lin owed him (the abductor) money, and that therefore, Haber owed the abductor money. This abductor said that Lin owed him two million dollars. Haber asked Lin to let him go back to his hotel to make arrangements to make the payment but Lin refused to let them go. Yeh, Haber, and Ziv decided that Yeh would come up with USD $1 million and Haber and Ziv would come up with $2 million. Yeh then told Lin that they could come up with USD $ 3 million and, after some further discussion, the abductors agreed to take USD $3 million.

19. Haber then told the abductors that he couldn't get any money for them unless they gave him his cellular telephone. The main abductor gave Haber his telephone, and Haber used it to send a text message to his son Max in Los Angeles, telling Max that he (Haber) needed two million dollars immediately. The text message was sent at approximately 6:00 a.m. on February 26, 2009 (Los Angeles time). As described below, Max, together with Bel-Air Lighting controller Paul Rush, arranged for the ransom payments.

20. Ziv stated that he was "scared to death" during the abduction. Eventually, he convinced his abductors to give him

his cellular telephone so that he could attempt to get them the money they were demanding. He called Rush in Los Angeles and told him that he (Ziv) was in trouble and needed USD $2,000,000.00 transferred first to Yeh's account in Taiwan, and then to Lin's bank account in Hong Kong. Ziv did not tell Rush that they had been kidnaped because he feared his captors would hurt him if he did.

21. Bel Air Lighting had one million dollars in Taiwan prior to the abduction, and approximately $600,000 in liquid assets in the United States. Rush used Bel-Air's credit line to obtain an additional 1.4 million dollars ( for a total of USD $3,000.000).

22. On February 26, 2009 at 10:13 a.m. and 11:23 a.m. Los Angeles time (-16 hours from Hong Kong), two wire transfers were made from US-based bank account XXXXXX7087 at Wells Fargo Bank to Yeh's Tai-Trans Trading Co. account. The first transfer was USD $600,000, and the second was USD $1,400,000. After the money was pooled in Yeh's Tai-Trans Trading Co. account, the wire transfer records were emailed to Ziv's cellular telephone and shown to the abductors to prove that the money had been transferred. Yeh verbally promised Lin that he would pay Lin the additional USD $1 million, and Lin told Yeh to deduct USD $160,000 which he owed Yeh, and to pay him (Lin) USD $2.84 million. Yeh was to pay LIN the additional USD $4.65 million in five installments.

23. The abductors drafted a promissory note with a schedule of payments for the remaining ransom money. The abductors made

Yeh put his fingerprints on the note, using a red ink pad at the cabin, and took a picture of Yeh, Haber, and Ziv. The abductors said that they had connections in Taiwan, Germany, and the United States, and that if Haber did not pay the remaining balance, these people would find the victims and hurt them and their families. The abductors also threatened to publicize the photo so Bel-Air and Yeh would not be able to conduct business in China in the future. Yeh then called his wife in Taiwan and instructed her to wire transfer the ransom money into the Paulite account at Chinatrust Commercial Bank, Hong Kong. On February 27, 2009, USD $2,839,285.13 was transferred from the Tai-Trans Trading Co. account to Paulite's Hong Kong-based bank account 904133019200 at Chinatrust Commercial Bank, from which the defendant bank funds ultimately were seized.

24. When Lin and the other abductors saw the notifications that the wire transfer to Paulite had been completed, they initially said that Haber and Ziv could leave, but that they would continue to hold Yeh and Hugh until the remaining balance demanded ($5,000,000) was paid. Lin and the abductors eventually agreed to release all of them.

25. The victims were held by the kidnapers from approximately 4:00 p.m. on February 26, 2009 until approximately 2:00 a.m. on February 27, 2009 (local time).

26. Upon their release, Haber, Ziv, Yeh, and Hugh were allowed to take Yeh's Accord. Yeh or Hugh recognized the road to Yan Tian. Haber was extremely fearful after the release and

wanted to go directly to the airport to return to the United States, but Yeh pointed out that they needed to return to their hotel to recover their belongings and passports. When they arrived at their hotel, (Hotel Sofitel-Dongguan City), they barricaded themselves inside their rooms for approximately two hours before driving to the airport. Haber and Ziv discovered that the soonest flight to Los Angeles was at 11:00 p.m. that evening (February 27, 2009 local time), so they went to an airport hotel to wait. Yeh took an immediate flight to Taiwan. Haber and Ziv arrived in Los Angeles on February 27, 2009, at approximately 7:00 p.m. (local time).

27. Haber did not report the incident to local police in China before leaving the country because he was fearful and understood that he would not be allowed to leave the country for several days if he reported the kidnaping.

**FIRST CLAIM FOR RELIEF**

**(18 U.S.C. § 981(a)(1)(C))**

28. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property constituting or derived from proceeds traceable to specified unlawful activity (as defined at 18 U.S.C. § 1956(c)(7)(D)), is subject to seizure by and forfeiture to the United States. Hostage taking (18 U.S.C. § 1203) is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(D). Plaintiff alleges that the defendant bank funds represent proceeds of the hostage-taking described herein, or are traceable thereto, and are therefore

subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**

**(18 U.S.C. § 981(a)(1)(A))**

29. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 is subject to forfeiture to the United States. Federal money laundering statutes, including § 1956, prohibit financial transfers or transactions involving the proceeds of specified unlawful activity, transactions intended to promote specified unlawful activity, and international money transfers intended for an illegal purpose. The transactions described herein were in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), and (a)(2)(A), and § 1957, and the defendant bank funds were involved in those violations within the meaning of § 981(a)(1)(A), rendering them subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

30. Moreover, pursuant to 18 U.S.C. § 984 (forfeiture of fungible property), because the property sought here is money, the source of the precise money seized from the account does not insulate it from seizure or forfeiture because the incidents described herein occurred within the last 12 months.

WHEREFORE, the United States prays that:

a. due process issue to enforce the forfeiture of the

defendant bank funds and that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

b. judgment be entered declaring that the defendant bank funds are forfeited to the United States of America for disposition according to law;

c. the United States of America be awarded all of its costs, expenses and disbursements; and

d. the United States of America be awarded any other and further relief as the Court deems just and proper.

DATED: October 8, 2009

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
United States of America

VERIFICATION

I, David M. Cloney, declare and say that:

1. I am a Special Agent with the Federal Bureau of Investigation, and am the case agent for the investigation described in the attached Complaint for Forfeiture.

2. I have read the Complaint for Forfeiture and know the contents thereof.

3. The information contained in the Complaint is either known to me personally, was told to me by persons with personal knowledge of the facts, was furnished to me by official government sources, or was obtained pursuant to subpoena. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 8th day of October, 2009 at Los Angeles, California.

SA DAVID M. CLONEY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge A. Howard Matz and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

**CV09- 7340 AHM (AJWx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[ ] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

COPY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
United States of America

**DEFENDANTS**
$455,951.00 in Funds Seized from Chinatrust Commercial Bank

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Steven R. Welk, Assistant United States Attorney
1400 United States Courthouse, 312 North Spring Street
Los Angeles, California 90012; Telephone: (213)894-6166 Fax: (213) 894-7177

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No

☐ **MONEY DEMANDED IN COMPLAINT: $**__________

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. § 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT (Place an X in one box only.)**

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**TORTS**
PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE / PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☑ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

CV09-7340

**FOR OFFICE USE ONLY:** Case Number: __________

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s):

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)
☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature] **Date** October 8, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |